*892 Opinion

per curiam,.;

These cases were heard by the Honorable W. Ney Evans, a commissioner ox this court, who rendered reports of his findings of fact. By an order of the court dated July 25, 1955, the court pursuant to Buie 45 (c), directed Commissioner Evans to submit recommendations for conclusions of law in these cases. líe has done so, in the form of an opinion giving reasons and citing precedents. The court adopts the opinion and conclusions of Commissioner Evans which are printed below and renders judgments for the plaintiffs in the amounts shown in the Conclusion of Law.
It is so ordered.
RECOMMENDATION BT THE COMMISSIONER
In each of these 80 cases a customs inspector seeks to recover extra compensation under section 5 of the Act of February 13, 1911, as amended,[1] in addition to the extra compensation that has already been paid to him under that Act for services performed on assignments to extra duty.
Whether or not the plaintiffs are lawfully entitled to this additional extra compensation is the only legal issue involved in any of the cases. Moreover, the legal issue is the only issue in any of the cases except for two questions of fact relating to parts of the claims of seven of the plaintiffs in the Sander-son group. Inasmuch as the facts are determined in plaintiffs’ favor in each instance,[2] resolution of the legal issue is dispositive of the cases.
Collectors of customs were authorized as early as 1813[3] to fix reasonable extra compensation for night time services by customs inspectors, and to exact the amount of such compensation from the licensees who required the services.[4] The 1911 Act was the lineal descendant of the 1873 statute. It continued the provision for extra compensation for night *893 time services and added a provision for extra compensation for work on Sundays and holidays. The authority of the collector to exact the cost of the extra compensation from the licensees was also continued, in the 1911 Act and in the amendments thereto of 1920, 1922, and 1930.[5]
The Bureau of Customs interpreted these statutory provisions to mean that extra compensation was payable for night services and work on Sundays and holidays only to the extent that the cost of such compensation was obtained from the licensees.
In United States v. Myers, 320 U. S. 561, the Supreme Court upheld the contention of a group of customs inspectors at the port of Detroit that payment of the extra compensation authorized by the statute was an obligation of the United States, regardless of the collector’s failure to require or obtain reimbursement. Further amplification was made by this court in O'Rourke v. United States, 109 C. Cls. 33.
In the instant cases the parties have agreed that, with one exception hereinafter noted, the facts fall within the pattern of Myers and O'Rourke, and defendant does not now challenge the standards approved in those cases. The parties have also agreed upon computations showing the amounts the several plaintiffs should receive if they are entitled to recover.
The reasons assigned by the Bureau of Customs for refusing to pay the claims of these plaintiffs in the course of administrative procedures were based on rulings by the Comptroller General. His reasons, in turn, were somewhat narrower than those assigned in support of the refusal in defendant’s brief.
Myers was decided in 1944. The services performed by the plaintiffs in the instant cases were performed in 1944 and prior years, before the Bureau of Customs altered its regulations to conform with the Myers decision.
The 30 cases now under consideration were filed in 1945, 1946, and 1947. During the eight to ten years since these cases were commenced, hundreds of claims filed in this court *894 by inspectors of the Customs and Immigration[6] Services have been concluded by judgments stipulated on the authority of the test cases.[7] Only these suits remain.
In 1949, the claims of three immigration inspectors were denied by the Comptroller General on the ground that their claims were based on services performed during assignments to extra duty, whereas Myers and Renner-Krupp were both founded on services performed during regular tours of duty.[8] The ruling held specifically:
There is no legal basis or requirement that the changes in the regulations, based upon a construction of the controlling statute by the courts different from the long-existing practice, be given retroactive effect, as to cases arising prior to the changes in the situation here involved where the facts in the cases differ from those upon which the decisions of the court were based. * * *
This ruling was repeated by the Comptroller General on April 23, 1951, in his denial of the claim of Charles J. Houska, one of the plaintiffs in the Sanderson group. Houska’s services had involved irregular or special assignments, rather than regular tours of duty.[9]
Within a few months after the Comptroller General’s ruling was initially made, the Bureau of Customs announced its position to be that “claims may properly be made pursuant to the Myers and O^Bourhe cases for periods of work for which no 1911 Act payment was previously made, but that periods for which payment was previously made under the 1911 Act as then interpreted should not now be reopened for readjustment.”[10] The Comptroller General’s ruling, above quoted, was cited in support of the ruling.
*895 This is the position to which the Bureau of Customs has since adhered. It was the basis of the Bureau’s refusal to accede to stipulated judgments in these cases on the authority of Myers and O'Rourke.
All of the claims of all of the plaintiffs in the Handily and Schaible groups, all of the claims of the plaintiff Houska, of the Sanderson group, and a part of each of the other claims in Sanderson are based on services performed during assignments to extra duty.
Defendant’s brief does not distinguish these claims from Myers and O'Rourke on such narrow ground.
The services at issue were not only performed on assignments to extra duty. They were performed, in part, for licensees from whom ,the cost of extra compensation could be and was collected. As a consequence, each of these plaintiffs has been paid some extra compensation for the services performed on the assignments in question, and the amount paid in each instance was all that the regulations then in force provided for. The amount so paid was not, however, as much as it would have been if the extra compensation had been computed under the standards approved in Myers and O'Rourke. Each of the plaintiffs sues for the difference. This difference represents “the extra compensation * * * in addition to the extra compensation that has already been paid * * *” to which reference was made in the opening sentence of this opinion.
Defendant’s brief states the question at issue in this way:
Are plaintiffs, having been paid extra compensation, without protest, at the statutory rates for periods of “overtime” and “Sunday and holiday” duty, as those terms were construed in the Customs Regulations in effect prior to the decisions in the Myers and O'Rowke cases, entitled to be paid the additional compensation which would result from a recomputation of their compensation based upon the interpretation of the statutory terms “overtime” and “Sunday and holiday” in the Myers and O'Rourke cases?
Answering this question in the negative, defendant asserts these propositions:
The law is well settled that where compensation is provided by statute, or by regulation having the force and *896 effect of a statute, payment of an amount other than ,the compensation so provided under a mutual mistake of law, without protest by the payee and without fraud or misrepresentation on the part of the payor, is conclusive on the parties. * * *
* * * There is also substantial authority for the proposition a rate of compensation can be waived by acquiescence to payment of a lesser amount.
In support of these propositions defendant cites the following cases wherein recovery was denied: United States v. Edmonston, 181 U. S. 500 (1901), overpayment for public lands; Utermehle v. Norment, 197 U. S. 40 (1905), underpayment of a share of an estate; Baltimore & Ohio Railroad Company v. United States, 52 C. Cls. 468 (1917), land-grant freight rates accepted without protest; Oregon-Washington Railroad & Navigation Company v. United States, 255 U. S. 339 (1921), land-grant freight rates; Western Pacific Railroad Company v. United States, 255 U. S. 349 (1921), land-grant freight rates; Western Union Telegraph Company v. Esteve Brothers & Company, 256 U. S. 566 (1921), telegraph rates; Blumenthal v. United States, 4 F. 2d 808 (1925), money paid under a statute later declared unconstitutional; Dollar S. S. Line v. United States, 75 F. 2d 444 (1935), mail rate; Furrow & Co., et al. v. American Airlines, Inc., 102 F. Supp. 808 (1952), air freight rate; United States v. Interstate Commerce Commission, 198 F. 2d 958 (1952), freight rates; Union Pacific Railroad Company v. United States, 132 C. Cls. 213 (1955), freight rates.
All of the cases cited by defendant are apposite to the denial of recovery where the amount sought was paid or withheld under a mistake of law. As plaintiffs in their brief admit: “No one would question the validity of the legal principles enunciated in the cases which defendant reviews ® *
Eight of the 11 decisions cited by defendant are rate cases of one kind or another. Bate cases represent one field wherein the courts generally have made few, if any, exceptions to the rule which denies recovery for a mistake of law. In many other situations the exceptions have seriously eroded the rule. But in rate cases there is usually no evidence of great hardship if the parties are left where their trans *897 action placed them, while there is always present the counterbalancing considerations favoring an end to accounting adjustments. Consequently, in claims for adjustments of rates which have been applied or accepted without protest, carriers and shippers are usually confronted with overriding elements of estoppel and waiver.
Plaintiffs put forward the proposition that “the acceptance by an employee of less than the lawful compensation for his services does not bar a claim by him for the difference,” and support it with the following cases wherein recoveries were allowed: Adams v. United States, 20 C. Cls. 115 (1885), mail contract pay; United States v. Symonds, 120 U. S. 46 (1887), Navy officer’s pay for sea duty; United States v. McDonald, 128 U. S. 471 (1888), Navy officer’s mileage for travel; Miller v. United States, 103 Fed. 413 (1900), salary of special inspector of foreign vessels; Whiting v. United States, 35 C. Cls. 291 (1900), salary of a member of the Mississippi River Commission; Glavey v. United States, 182 U. S. 595 (1901), salary of special inspector of foreign vessels; United States v. Andrews, 240 U. S. 90 (1916), Army officer’s leave pay; McMath v. United Stales, 248 U. S. 151 (1918), salary of a customs weigher; Bancroft v. United States, 56 C. Cls. 218 (1921), Marine Corps uniform gratuity; Emmons v. United States, 63 C. Cls. 121 (1927), Army officer’s flight pay; McSweeny Trade School, Inc. v. United States, 131 C. Cls. 445 (1955), nonwaiver of trade school tuition rate; Seagrave v. United States, 131 C. Cls. 790 (1955), Army officer’s retired pay.
Defendant would distinguish the cases cited by plaintiffs on the ground that in each instance the claim arose out of a refusal to apply the statute, whereas in the cases under consideration there was an endeavor, in which plaintiffs acquiesced, to apply the statute.
It is true that none of the cases cited in any of the briefs is on all fours with the facts of the cases under consideration, wherein payments were made ,to and accepted by public employees without protest under a regulation which later proved to be founded on an erroneous interpretation of the statute.
*898 It is likewise true that no case has been cited or found, involving the pay of a Federal employee, in which the court has made a comprehensive analysis of its reasons for refusing to apply the doctrines of waiver and estoppel in excepting pay cases from the general rule denying recovery for a mistake of law.
Some of the State courts have done better. The cases are collected in annotations in 70 A. L. R. 972, 118 A. L. R. 1458, and 160 A. L. R. 490.
The clear weight of authority and the better reasoning favor the view that full statutory compensation of public employees is mandatory, on grounds of public policy. Any suggestion of barter and trade in public employment is thereby eliminated. In order to make certain of this result, protection is afforded against the pardonable, and even commendable zeal of administrative officials in the application of statutory standards through regulations, if as a matter of law their sights were too low. For these reasons, doctrines of waiver and estoppel have no application in situations such as are here under consideration.
FINDINGS OF FACT
The court, having considered the evidence, the reports of Commissioner W. Ney Evans, and the briefs and arguments of counsel, makes findings of fact as follows:
SCHAIBLE GROUP[1]
1. (a) Each of the plaintiffs is a citizen of the United States and was, during the period covered by his claim, a duly appointed customs officer who acted in that capacity in the performance of the inspectional services involved in his claim.
(b) The period covered by plaintiffs’ claims extends from November 1939 through February 1944.
*899 (c) Each of tlie plaintiffs performed the regular tours of duty required to earn, and has been paid, his base salary for the entire period involved in his suit.
(d) Each of the plaintiffs has been paid all overtime compensation payable in accordance with the War Overtime Pay Acts of 1942 (56 Stat. 1068) and 1943 (57 Stat. 75) for hours of work performed in excess of 40 hours per week, excluding the hours included in suit for which reimbursable extra compensation under the customs extra pay laws (Act of February 13, 1911, as amended) was paid in accordance with then existing regulations.
2. All of the services, by all of the plaintiffs, for which claim is made, were performed at the port of Baltimore, with the exception of the plaintiff Weld, whose services were performed at the port of Seattle. Each of these ports is a seaport serving international traffic by oceangoing vessels and connecting land carriers. Amounts earned as extra compensation and paid by the Government to inspectors in the performance of assignments to duty outside regular tours of duty[2] were reimbursable to the Government by parties in interest.
3. Throughout the periods in suit, the established business hours at the port of Baltimore were from 8 a. m. to 5 p. m. Monday through Saturday.[3] Under then existing regulations, as applied at the port of Baltimore, inspectional services which were provided on Sundays and holidays and between the hours of 5 p. m. and 8 a. m. on any day were by assignments to duty outside the regular tours of duty of the officers so assigned. The entire period from 5 p. m. of the day before a Sunday or holiday to 8 a. m. of the day following such Sunday or holiday was subject to such assignments to extra duty. Performance of such assignments to extra duty was required of the available customs inspectors stationed at the port on a system of rotation which was followed with substantial regularity.
*900 4. Plaintiffs’ regular daily tours of duty throughout the periods covered by their claims were from 8 a. m. to 5 p. m. with one hour for food and rest. From November 1939 to December 20, 1942, the basic workweek was 44 hours, Monday through Saturday. Beginning December 21,1942, the regularly scheduled administrative workweek was 48 hours, Monday through Saturday. None of the plaintiffs worked on Sundays or on observed holidays or between 5 p. m. and 8 a. m. on any day, except as assigned to duty outside his regularly scheduled basic or administrative workweek. Each of the plaintiffs performed some services during the period in his suit on assignment to duty outside his regular tour of duty.
5. The services performed by plaintiffs during their assignments to extra duty were the type of services compensable under the provisions of section 5 of the Act of February 13, 1911, and section 451 of the Tariff Act of 1930, as amended (19 U. S. C. 267, 1451). Each of the plaintiffs has been paid extra compensation for the periods of duty so performed, computed in accordance with the published regulations of the Treasury Department, Bureau of Customs, in force and effect at the time the services were performed.
6. (a) The Customs Regulations applicable at the time plaintiffs’ services were performed were Customs Regulations of 1937,[4] which were superseded, effective July 1, 1943, by the Customs Regulations of 1943.[5]
(b) Those portions of the Customs Regulations of 1937 which were in effect during the periods in suit and which deal with assignments to duty and the computation of extra compensation as provided by section 5 of the Act of February 13, 1911, as amended by the Act of February 7, 1920,[6] or section 451, Tariff Act of 1930, as amended,[7] are set forth in finding 11.
(c) Pertinent portions of the provisions of the Customs Regulations of 1943, including section 24.16, as formally re *901 vised[8] after the decision of the Supreme Court in United States v. Myers,[9] are set forth in finding 12.
7. In these suits each of the plaintiffs claims the difference between the amount of extra compensation which has been paid to him and which was computed on the basis prescribed by the regulations in force at the time the services were performed, and the amount of extra compensation which he would have received if the method of computation used had been that which was subsequently established in accordance with the final decision of the Myers case.
8. Each of the claims is for extra compensation, as described in the preceding finding, for services performed on certain Sundays or national holidays, and for services performed beginning at 5 p. m. on the day preceding and continuing into such Sunday or holiday, or beginning on a Sunday or holiday and ending after 1 a. m. on the day following such Sunday or holiday.
9. The differences in compensation, as described in finding 7, for the services described in finding 8, as to each of the several plaintiffs, are as follows:[10]

Plaintiff Number Amount

Alfred E. Belbin-- 47146 $314.65
Henry T. Bowden-- 46784 653. 84
Harry A. Coburn-- 46990 466.58
Wilbur R. Dyott-- 46998 406.65
Claude C. Graves-- 46956 710.18
Garland C. Marine-- 47344 457.57
Tbomas S. H. Reese-- 47021 386.15
Donald R. Roberts-- 47022 442.29
Arthur P. Rogers-- 47166 409.43
Gorman L. Schaible [11]-- 46945 797.06
Calvin S. Stran-- 46974 617.24
Edward P. Walters-- 46968 745.82
*902 Lute T. Weld[12] -- 46873 $224.97
Daniel W. Ziegfeld-- 46941 647.46
If the plaintiffs are entitled as a matter of law to recover, in accordance with the Myers case and the decision of this court in O'Rourke v. United States, 109 C. Cls. 38, the amounts of extra compensation which they earned during the periods of their suits and which have not been paid, taking into account deductions for sums already paid, are the amounts above listed opposite their names.
10. Under the regulations in effect throughout the time the services described in finding 8 were performed:
(a) Extra compensation for services on special assignments (i) between 5 p. m. of a Saturday or day preceding a holiday and 8 a. m. of the Sunday or holiday or (ii) between 5 p. m. of a Sunday or holiday and 8 a. m. of the next regular work day was computed at the rate for “overtime” services prescribed in section 5 of the Act of February 13, 1911, as amended, and the limitation of two and one-half days’ pay was applied to the full period from 5 p. m. to 8 a. m.
(b) Extra compensation for services performed on special assignments between 8 a. m. and 5 p. m. on a Sunday or holiday was computed at the rate for “Sunday or holiday” services prescribed by section 5 of the Act of February 13,1911, as amended, and the amount computed for the full period from 8 a. m. to 5 p. m. on a Sunday or holiday was limited to two days’ pay.
(c) No part of the extra compensation for services on special assignments performed before 8 a. m. or after 5 p. m., within the 24 hours of a calendar day which was a Sunday or holiday, was computed at the rate for “Sunday or holiday” services prescribed by section 5 of the Act of February 13,1911, as amended.
(d) No part of the extra compensation for services on special assignments performed after 8 a. m. and before 5 p. m. *903 on a Sunday or holiday was computed at the “overtime” rate prescribed by section 5 of the Act of February 33, 1911, as amended.
(e) No extra compensation at rates prescribed by section 5 of the Act of February 13,1911, as amended, was paid for inspectional services performed by customs officers on regular tours of duty.
11. Pertinent portions of the Customs Regulations of 1937, as amended, follow:
Extra compensation.[13] — (a) Customs officers and employees performing services at night, or on Sundays and holidays, for lading or unlading of cargo or merchandise, or lading cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in connection with the receiving or delivery of cargo or merchandise on or from the wharf, or in connection with the unlading, receiving or. examination of passengers’ baggage, or in boarding vessels, or in the entrance and clearance of vessels, or in the issuance and recording of their marine documents and instruments of title, shall receive extra compensation, to be paid by the master, owner, or agent of the vessel, or by the transportation company.
(b) Boarding officers shall receive extra compensation for night services and Sunday and holiday service at the same rates as other customs officers, the amount of such extra compensation to be prorated among the various vessels boarded.
(c) The rates of extra compensation are payable in cases where the services of customs officers or employees have been duly requested and the officers or employees have reported for duty, even though no actual service may be performed.
(d) Customs officers and employees should be ordered to report for duty sufficiently in advance of the expected arrival of a train or vessel to properly safeguard the revenue. However, waiting time should be reasonable and compatible with the circumstances in each case.
(e) The extra compensation for overtime services is in addition to the regular compensation paid by the Government in the case of officers and employees whose compensation is fixed on the ordinary per diem basis and those receiving a compensation per month or per annum.
(f) Extra compensation for “waiting time” will not *904 be allowed unless and until an officer or employee actually reports for duty.
(g) Extra compensation will not be allowed for overtime services rendered in connection with visaing passports and inspecting baggage of passengers destined to foreign ports; searching vessels and freight trains for contraband articles; inspecting car seals and checking manifests; and examining vessels under the Passenger Act of 1882.
Definition of “night"’ and “holiday.”[14] — For the purpose of computing extra compensation the word “night” will be construed to mean the time from 5 p. m. to 8 a. m. and the term “holiday” shall include only national holidays, viz, January 1, February 22, May 30, July 4, the first Monday in September, November 11, Thanksgiving Day (when designated by the President), and December 25, and such other days as may be made national holidays.
Rate of compensation.[15] — For service performed after 5 p. m. of any days, including Sundays and holidays, one-half day’s pay will be allowed for each 2 hours or fraction thereof of at least 1 hour that the overtime extends beyond 5 p. m., provided that the overtime is not less than 1 hour. The maximum amount which may be paid an employee for services between 5 p. m. and 8 a. m. shall not exceed 2% days’ pay.
(b) In computing the amount earned for overtime at the rate of “one-half day’s pay for each 2 hours or fraction thereof of at least 1 hour that the overtime extends beyond 5 p. m.,” one-half day’s pay shall be one-half of the gross daily rate of pay; each two hours is the time period for purpose of computation; at least 1 hour means the minimum service in each period for which extra pay may be granted. If service continues beyond a 2-hour period, it must extend for at least 1 hour into the following 2-hour period to be entitled to extra pay for the second period. When the overtime extends beyond 5 p. m. payment of extra compensation from 5 p. m. for services consisting of at least 1 hour is authorized, even though such services may not actually begin until 7 p. m., 9 p. m., or later j Provided, however, That the officer rendering the service remained on duty from 5 p. m., in which case the time between 5' p. m., and the time of beginning the actual service shall be computed as waiting time, and *905 where the actual services begin as late as .9 p. m. there should be an affirmative statement that the officer was required to remain on duty between 5 p. m. and 9 p, m. if a charge for waiting time is made. Where, however, service is rendered between 6 a. m. and 8 a. m. only, the charge for such services, or 1 hour thereof, will be one-half day’s extra pay.
(c) In computing extra compensation where the services rendered are in broken periods and less than 2 hours intervene between such broken periods, the time served should be combined with the waiting time and computed as continuous service.
(d) Where 2 hours or more intervene between broken periods, one-half day’s extra pay will be allowed for each distinct 2-hour period or part of a 2-hour period, if waiting time and actual service rendered within each period consist of at least 1 hour.
(e) The same construction should be given the Act when charging for waiting time as governs the charge for services actually rendered. No charge should _ be made unless after having reported for duty the waiting time amounts to at least 1 hour.
Simdays and Holidays.[16] — (a) For authorized services performed on Sundays and holidays between 8 a. m. and 5 p. m., customs officers and employees shall be entitled to 2 days’ pay in addition to their regular compensation.
(b) Officers and employees who are paid on a per diem basis “when employed” will receive no other compensation for services rendered by them on Sundays and holidays than that allowed under the Overtime Act.
(c) If overtime service is performed on Sundays or holidays in connection with the unlading or other authorized service for 2 or more vessels or vehicles the 2 days’ extra compensation shall be prorated between the different vessels or vehicles.
Hours of business.[17] — (a) Customs offices shall be open between the hours of 9 a. m. and 4:30 p. m. on all days of the year, except Saturdays, Sundays, and national holidays, and on Saturdays, except national holidays, from 9 a. m. to 1 p. m., unless a variation in these hours is necessitated by local conditions and is approved by the Commissioner of Customs. So far as the transaction of public business will permit, customs employees *906 may be excused on State holidays: Provided, however, That no such employee shall be excused from performing 4 hours’ work, exclusive of time for luncheon, on Saturdays, without being charged the time absent, because of any State law granting part holidays on Saturdays. (See Art. 1462 (e).)
(b)The national holidays are January 1, February 22, May 30, July 4, the first Monday in September, November 11, Thanksgiving Day (when designated by the President), and December 25. If a holiday falls on Sunday the following day will be observed.
Hours of service.[18] — (a) The official hours of officers, clerks, examiners, and employees, except those hereinafter specified, will be from 9 a. m. to 4:30 p. m., with a half hour for lunch.
(b) The official hours of the following employees will be: Staff officers, station inspectors, and inspectors to whatever duty assigned, sugar samplers, samplers, laborers, storekeepers, and outside messengers, from 8 a. m. to 5 p. m., 1 hour for lunch; verifiers-openers-packers and openers and packers, 8 a. m. to 4:30 p. m., one-half hour for lunch; customs guards not less than 8 hours.
(c) The above hours may be extended as the needs of the service demand, and such extension shall be without additional compensation, except as provided for in the Act of February 13, 1911, as amended by the Act of February 7,1920,
(d) The Act of February 7, 1920, also provides that in those ports where customary working hours are other than those above'mentioned, the collector of customs is vested with authority to regulate the hours of customs employees so as to agree with prevailing working hours in said port, but nothing contained in this proviso shall be construed in any manner to affect or alter the length of a working-day for customs employees or the overtime pay fixed for such employees.
12. Pertinent portions of the Customs Regulations of 1943 follow:
Customs RegulatioNS of 1943[19]
Sec. 1.8 Hours of business. — Customs offices shall be open between the hours of 9 a. m. and 4: 30 p. m. on all days of the year, except Saturdays, Sundays, and na *907 tional holidays,[20] and on Saturdays, except national holidays, from 9 a. m. to 1 p. m., unless a variation in these hours is necessitated by local conditions and is approved by the Commissioner of Customs or these hours are otherwise changed by special instructions.[21] So far as the transaction of public business will permit, customs offices may be closed on state holidays. However, no employee shall be excused, because of any state law granting part holidays on Saturdays, from performing 4 hours’ work, exclusive of time for luncheon, on Saturdays.
Sec. 24.16 Overtime services; overtime compensation; rate of compensation, (a) Customs services for which overtime compensation is provided for by section 5 of the Act of February 18, 1911, as amended by the Act of February 7,1920 (19 U. S. C. 267), or section 451, Tariff Act of 1930, as amended, shall be furnished only upon compliance with the requirements of those statutes for applying for such services and giving bonds to secure the payment of overtime compensation. Such overtime compensation shall be collected by the collectors from the parties for whom the services are rendered. Customs officers or employees shall not receive overtime compensation for services performed on regular tours of duty at night or on Sundays or holidays.
(b) An application for services of customs officers at night or on a Sunday or holiday, customs Form 3171 or 3853, supported by the required bond, shall be filed with the collector before the assignment of customs officers and employees for overtime service.
(c) When overtime services not in connection with lading or unlading under special license are requested, the person requesting such services shall give a bond on customs Form 7599 in a penal sum to be fixed by the collector, conditioned to pay the overtime compensation and expenses before the customs officers or employees are assigned to such duty.
(d) Customs officers and employees shall be ordered to report for overtime duty sufficiently in advance of the expected arrival of the vessel or other conveyance *908 to properly safeguard the revenue. Extra compensation for reasonable waiting time compatible with the circumstances in each case shall be allowed. The charge for overtime services rendered shall not begin until the customs employee is in a duty status at the place where the services are to be actually rendered and shall terminate when he leaves that place.
(e) The same construction shall be given the customs overtime act, as amended, when charging for waiting time as governs the charge for services actually rendered. No charge shall be made unless, after having reported for duty, the waiting time amounts to at least 1 hour.
(f) For the purpose of computing overtime compensation, the word “night” shall be construed to mean the time from 5 p. m. to 8 a. m. and the term “holiday” shall include only national holidays.[22]
(g) For service performed after 5 p. m. or before 8 a. m. on any weekday, Sunday, or holiday, one-half day’s pay shall be allowed for each 2 hours or fraction thereof of at least 1 hour. Overtime compensation shall not be paid for overtime service at night of less than 1 hour. Maximum amount of overtime compensation which shall be paid an employee for services between 5 p. m. of one day and 8 a. m. of the following day shall not exceed 2% days’ pay.
(h) For the purpose of computing the amount earned as compensation for overtime services, the term “one-half day’s pay” shall be construed to be one-half of the gross daily rate of regular pay of the officer or employee who has performed the service. If overtime service continues beyond a 2-hour period, it must extend for at least 1 hour into the following 2-hour period to entitle the officer or employee rendering such service to any overtime compensation for the following period.
(i) When the services rendered are in broken periods and less than 2 hours intervene between such broken periods, the time served shall be combined with the waiting time and computed as continuous service.
(j) When 2 hours or more intervene between broken periods, one-half day’s extra pay shall be allowed for each distinct 2-hour period or part of a 2-hour period, if waiting time and actual service rendered within each period amount to at least 1 hour.
*909 (k) For any authorized overtime services performed on a Sunday or holiday between 8 a. m. and 5 p. m., customs officers and employees shall be entitled to 2 days’ pay in addition to their regular compensation.
(l) Officers and employees who are paid on a per diem basis when employed shall receive no compensation for services rendered by them on Sundays and holidays other than that allowed under the customs overtime act, as amended.
(m) The basis on which to compute the overtime compensation for overtime services rendered by a permanent part-time employee, is the gross daily rate of pay which the part-time employee would receive if he were a full-time employee in the position which he holds.
(n) If overtime service is performed at night or on a Sunday or holiday in connection with boarding, un-lading, or other authorized service for two or more vessels or vehicles, the overtime compensation shall be prorated between the different vessels or vehicles.
Customs RegtjlatioNS oe 1948, as AmeNded [23]
24.16 Overtime services; overtime compensation; rate of compensation.—
(a) General. — Customs services for which overtime compensation is provided for by section 5 of the Act of February 13, 1911, as amended (19 U. S. C. 267)[24] or section 451, Tariff Act of 1930, as amended,[25] shall be furnished only upon compliance with the requirements of those statutes for applying for such services and giving security for the reimbursement of the overtime compensation, unless the compensation is nonreimbursable under the said section 451. Reimbursements of overtime compensation shall be collected by the collectors from the applicants for the services. Customs employees shall not receive overtime compensation for services performed on regular tours of duty at night, but no regular tour of duty shall embrace any part of a Sunday or holiday if the services performed are such that extra compensation would be payable if performed at the request of a private interest. Reimbursable overtime services shall not be furnished to an applicant who fails to *910 cooperate with the Customs Service by filing a seasonable application therefor during regular hours of business when the need for the services can reasonably be foreseen, nor in any case until the maximum probable reimbursement is adequately secured.
(b) Night, Sunday, and holiday defined. — For the purposes of this section the word “night” shall mean the time between 5 p. m. of any day and 8 a. m. of the following day, or between the corresponding hours at ports or stations where regular hours for the transaction of the general class of customs business involved other than those from 8 a. m. to 5 p. m. have been established to agree with local prevailing working hours, but shall not include any such time witiiin the 24 hours of a Sunday or holiday. The night hours at the end of the regular workday immediately preceding a Sunday or holiday and the night hours at the beginning of the next regular workday shall be considered for the purposes of this section as parts of a single night. For such purpose the term “holiday” shall include only days on which customs employees generally are not required to work and which are usually observed as national holidays.[26] The time accounted for as overtime shall be computed on the basis of the regular hours for the performance of the particular work of the assignment, even though such hours differ from the regular working hours of the employee assigned.[27]
(e) Application and bond. — An application for services of customs employees at night or on a Sunday or holiday, customs Form 3171 or 3853, supported by the required bond or cash deposit, shall be filed with the collector before the assignment of such employees for reimbursable overtime services. The bond to secure reimbursement shall be on customs Form 7597 or 7599 and in an amount to be fixed by the collector, unless another bond containing a provision to secure reimbursement is on file.
(d) Assignment. — Customs employees may be ordered to report for any overtime duty sufficiently in ad- *911 vanee of the time specified by the applicant to avoid unnecessary delay, but in no case more than 1 hour in advance of the time so specified unless the specified time is subject to change without reasonable notice as in the case of some aircraft arrivals. If no time can be specified for the services to begin, the employees required and available shall be assigned to the overtime duty as soon as practicable. Customs employees shall not be deemed available to perform reimbursable overtime services at night unless the total time of service, including waiting time, will be at least one hour, but nothing in this section shall prohibit the collector or other administrative officer from requiring an employee to perform, before he leaves his duty status and without extra compensation under the Act of February 13, 1911, as amended, any work which is pending at the beginning of the night and can be completed in less than 1 hour. No customs employee shall be assigned on a weekday, or for more than an aggregate of 8 hours on a Sunday or holiday, to any overtime service for which nonreimbursable extra compensation is payable, except under special authorization from the Commissioner of Customs.
(e) Nonperformance of requested services. — If services which have been requested and for which employees have reported are not performed by reason of circumstances beyond the control of the employees concerned, extra compensation shall be paid and collected on the same basis as though the services had actually been performed during the period between the time the employees were ordered to report for duty and did so report and the time they were notified that their services would not be required, and in any case as though actual performance had continued for at least 1 hour.
(f) Broken periods. — When overtime services at night or on a Sunday or holiday are rendered in broken periods and less than 2 hours intervene between such broken periods, the intervening waiting time, including any time required for travel between posts of overtime duty but not including any periods for meals or other time not spent at the post of duty, shall be included in the computation of overtime compensation as though the serviceshad been continuous. If 2 hours or more intervene between periods during which services are actually performed, the collector shall determine according to the circumstances of the case whether the service shall be treated as continuous with compensable waiting time or as to two or more distinct assignments with compensation to be computed separately for each assignment in *912 accordance with the provisions of paragraph (g). In no case shall any employee be entitled to receive more than 2% days’ pay by reason of the fact that he is given two or more assignments during one night.
(g) Bate for night service. — The reasonable rate of extra compensation for authorized overtime services performed by customs employees at night on any weekday is hereby fixed at one-half of the gross daily rate of regular pay of the employee who performs the service ' for each 2 hours of compensable time, any fraction of 2 hours amounting to at least 1 hour to be counted as two hours. The compensable time shall be the period between the beginning of the night and the conclusion of the services if the employee is assigned and reports for duty before the expiration of the first 4 hours of the night; the period between the time the employee is assigned and reports for duty and the conclusion of the services, plus 4 hours, if the time of assignment is after the expiration of the first 4 and before the beginning of the last 2 hours of the night; or 2 hours if the employee is assigned and reports for duty 2 hours or less before the end of the night. The compensable time for overtime service performed by a customs employee assigned to a regular tour of duty covering any part of a night shall be computed in accordance with this night rate as though the beginning of the regular tour of duty of such employee marked the end of a night period and the close of such tour marked the beginning of another night period, but extra compensation is not payable in accordance with this section for overtime services performed by any customs employee on a regular workday during other than the night hours of the port or station. The total extra compensation paid pursuant to this section to a customs employee for overtime services performed during one night shall not exceed 21/2 times the gross daily rate of his regular pay.
(h) Rate for Sunday or holiday service. — The reasonable rate of extra compensation for Sunday or holiday services, is hereby fixed at twice the gross daily rate of regular pay of the employee who performs the service for any and all services totaling an aggregate of not more than 8 hours during the 24 hours from midnight to midnight of the Sunday or holiday, including actual waiting time and time required for travel between posts of duty but not including any periods for meals or other time not spent at the post of duty. This rate shall apply regardless of the length of time served within the aggregate of 8 hours, whether it is served continuously or in *913 broken periods, and wbetber it is served for one or more applicants. Services in excess of an aggregate of 8 hours performed during the 24 hours of a Sunday or holiday shall be compensated on the same basis as overtime services performed at night on a weekday, the time between the completion of the aggregate of 8 hours and midnight being considered as the hours of a night.
(i) Part-time employees. — The extra compensation for overtime services performed by a permanent part-time employee at night or on a Sunday or holiday shall be computed on the basis of the gross daily rate of regular pay the part-time employee would receive for full-time service in the position held by him. Customs employees who are paid on a per-diem-when-employed basis shall be paid the overtime rate but not the per-diem rate when assigned to perform overtime services on a Sunday or holiday.
(j) Proration of charges. — If services are performed for two or more applicants during one continuous tour of overtime duty, the charge for the extra compensation earned shall be prorated equitably according to the time attributable to the services performed for each applicant. For the purpose of this paragraph the Government shall be considered the applicant for nonreimbursable overtime services.
(k) Participation in overtime work. — In general, services for which extra compensation is payable in accordance with this section, or for which reimbursement is required in accordance with section 24,17, shall be performed by employees who are regularly assigned to perform the same class of work during their regular tours of duty, but when the collector or other administrative field officer concerned finds that the needs of the Service so require he is hereby authorized to assign any other available and competent employee to perform such services and such employees while so assigned shall be deemed acting inspectors, acting storekeepers, etc., as the case may be.
SANDERSON GROUP[1]
1. (a) The claim of each of the plaintiffs is for additional pay for services performed by him as a customs inspector and *914 rests upon the application of section 5 of the Act of February 13,1911, as amended.[2]
(b) Each of the plaintiffs is a citizen of the United States and was, during the period covered by his claim, a duly appointed customs officer who acted in that capacity in the performance of the inspectional services involved in his claim.[3] The period covered by plaintiffs’ claims extends from October 1939 through September 1944.[4]
(c) Each of the plaintiffs performed the regular tours of duty required to earn, and has been paid, his base salary for the entire period involved in suit.
(d) Each of the plaintiffs has been, paid for all overtime performed under the War Overtime Pay Acts of 1942[5] and 1943.[6] None has received overtime pay under such Acts for services included in suit which are compensable at overtime rates under the 1911 Act.[7]
*915 2. Six of the 26 Public Acts adopted in 1789 by the 1st Congress pertained to customs duties of one kind or another. Ten years later the 5th Congress made an extensive revision of the laws regulating the collection of duties on imports and tonnage.[8] This statute included a provision[9] that “no goods, wares or merchandise, brought in any ship or vessel from any foreign port or place, shall be unladen or delivered from such ship or vessel, within the United States, but in open day, that is to say, between the rising and setting of the sun, except by special license from the Collector of the Port * * *." A companion Act[10] fixed the compensation of customs inspectors on a per diem basis at $2 per day. Collectors and surveyors received their compensation from fees, the amounts of which were fixed by the same statute.
Customs inspectors continued to be paid on a per diem basis until the Act of May 29, 1928,[11] placed them on fixed annual salaries.
The Act of March 3, 1873,[12] authorized the collector to fix reasonable extra compensation for nighttime service by customs inspectors. The collector was authorized to exact the extra compensation from the licensees requiring the nighttime service and to distribute it among the inspectors. These provisions were gradually extended to additional employees and to different circumstances.
The Act of 1911, relating to the lading and unlading of vessels, reflected only a revision and extension of earlier provisions. Extra compensation for nighttime services was continued, and was authorized for the first time for work on Sundays and holidays. The amendment of 1920 introduced the word “overtime,”[13] substituting it for “night services.” *916 The same amendment added the authority of the Collector of Customs to regulate the hours of employees “so as to agree with prevailing working hours in the port.” The Tariff Act of 1922 extended the provisions of the 1911 Act so as to cover passengers and baggage arriving by vehicle.[14]
3. The Bureau of Customs consistently interpreted these statutory provisions to mean that extra compensation for night services (“overtime”) and work on Sundays and holidays was payable only to the extent that compensation was obtained from, the licensees. Its regulations provided accordingly.[15]
4. The Customs Regulations of 1937[16] contained the following provisions:
Hours of business. Customs offices shall be open between the hours of 9 a. m. and 4:30 p. m. on all days of the year, except Saturdays, Sundays, and national holidays, and on Saturdays, except national holidays, from 9 a. m. to 1 p. m. * * *
Hours of service. The official hours of * * * inspectors’ * * * [will be] from 8 a. m. to 5 p. m., 1 hour for lunch.
Extra compensation. Customs.* * * employees performing-services at night, or on Sundays and holidays * * *, shall receive extra compensation, to be paid by the * * * vessel, or by the transportation company. * * *
. Definition of “night” and “holiday”. * * * the word “night” will * * * mean the time from 5 p. m. to 8 a. m. and the term “holiday” shall include only national holidays * * *.
*917 Bate of compensation. For service performed after 5 p. m. of any days, including Sundays and holidays, one-half day’s pay will be allowed for each 2 hours or fraction thereof of at least 1 hour that the overtime extends beyond 5 p. m. * * * The maximum amount which may be paid an employee for services between 5 p. m. and 8 a. m. shall not exceed 2% days’ pay. * * *
Sundays and holidays. For authorized services performed on Sundays and holidays between 8 a. m. and 5 p. m., customs * * * employees shall be entitled to 2 days’ pay in addition to their regular compensation. * * *[17]
5. (a) When the Customs Regulations of 1937 were adopted, the basic workweek was 40 hours for inspectors and 39 hours for deputy collectors.
(b) Effective January 26, 1942, and continuing through December 25, 1942, the basic workweek was 44 hours.
(c) From and after December 26, 1942, the basic workweek was 40 hours, and the regularly scheduled administrative workweek was 48 hours.
(d) In each instance the basic workweek applied to hours falling on weekdays, Monday through Saturday, while the scheduled administrative workweek extended to Sundays.
6. The Customs Regulations of 1943, effective July 1,1943, contained the following provisions:
Hours of business. Customs offices shall be open between the hours of 9 a. m. and 4:30 p. m. on all days of the year, except Saturdays, Sundays, and national holidays, and on Saturdays, except national holidays, from 9 a. m. to 1 p. m., unless a variation in these hours is necessitated by local conditions and is approved by the Commissioner of Customs * * *.[18]
Overtime services; overtime compensation; rate of compensation. Customs services for which overtime compensation is provided * * * by * * * the Act of * * * 1911 * * * shall be furnished only upon compliance with the requirements * * * for applying for such services and giving bonds to secure the payment of oveiv time compensation. Such overtime compensation shall *918 be collected by tbe Collector from the parties for whom the services are rendered. Customs officers or employees shall not receive overtime compensation for services performed on regular tours of duty at night or on Sundays or holidays. * *' *
* * * For the purpose of computing overtime compensation, the word might” shall be construed to mean the time from 5 p. m. to 8 a. m. and the term “holiday” shall include only national holidays.
For service performed after 5 p. m. or before 8 a. m. on any weekday, Sunday, or holiday, one-half day’s pay shall be allowed for each 2 hours or fraction thereof of at least 1 hour. * * * The maximum amount * * * shall not exceed 2yz days' pay. * * * For any authorized overtime services performed on a Sunday or holiday between 8 a. m. and 5 p. m. customs officers and employees shall be entitled to 2 days’ pay in addition to their regular compensation.
7. (a) On January 3, 1944, the Supreme Court decided the case of United States v. Myers.[19]
In 1937 five customs inspectors stationed at the port of Detroit had brought suit in the Court of Claims to recover extra compensation for overtime services and work on Sundays and holidays.[20] At that time the international boundary at the port of Detroit was served by three railway ferries, two nonrail ferries, two toll tunnels, and one toll bridge. The customs inspectors contended that regardless of the Collector’s failure to obtain the compensation from the licensees, the payment to them of such compensation was an obligation of the United States. These cases marked the beginning of the litigation which was ultimately determined by the Supreme Court decision above cited.
(b) The Supreme Court held (1) that the United States, as the employer, was obligated by the statutes to pay the extra compensation to the inspectors; (2) that payment for work on Sundays and holidays should be made without regard to the employee “remaining” on duty; and (3) that otherwise the.extra compensation was payable “only when there are overtime services in the sense of work hours in *919 addition to the regular daily tour of duty without regard to the period within the 24 hours when the regular daily tour is performed.”
(c) The Bureau of Customs interpreted the Supreme Court decision to mean that, while the extra compensation was an obligation of the United States and therefore payable in spite of the fact that the Collector of Customs had not obtained the extra compensation from licensees, this holding meant that henceforth the collector should obtain the extra compensation from such licensees. In other words, the payments of extra compensation thereafter made by the Bureau of Customs were based on services performed within the periods defined by the Supreme Court at stations where it was possible to obtain reimbursement from some transportation device such as a ferry, toll bridge, or toll highway or tunnel. Where traffic across the international boundary was served by a free highway (including a free bridge) or by other means from which reimbursement could not be obtained, no extra compensation was considered payable.
8. On February 12,1944, the Bureau of Customs issued to Collectors its Circular Letter No. 2439, as follows:
The case of Howard C. Myers v. The United States * * * was decided by the Supreme Court * * * on January 3, 1944. The court held, as to weekdays, that extra compensation was not payable for services performed on regular tours of duty between 5 p. m. and 8 a. m., but held that extra compensation was payable for services performed on Sundays and holidays even though such services were within the employees’ regular tours of duty. * * *
The opinion * * * does not seem clear as to whether Sunday and holiday work is limited to the hours from 8 a. m. to 5 p. m. * * *, or whether all work performed between midnight of a Saturday or day preceding a holiday and midnight of the Sunday or holiday is Sunday or holiday work within the meaning of * * * the act of * * * 1911 * * *. Pending further consideration * * * the following instructions are issued for your guidance * * *:
1. None of the six regular weekly 8-hour tours of duty * * * shall include any of the hours between 12 o’clock midnight Saturday and 12 o’clock midnight Sunday, except at highways, free bridges, and other places where *920 overtime compensation is not collectible from parties in interest.
2. No overtime compensation shall be paid to an employee * * * for any services performed * * * on one of his six regular weekly 8-hour tours of duty at any time between 12 o’clock midnight on a Sunday and 12 o’clock midnight on the following Saturday.
3. For services performed between 12 o’clock midnight Saturday and 12 o’clock midnight Sunday (except at- highways, free bridges, and other places where, overtime compensation is not collectible from parties in interest) extra compensation shall be collected and paid as follows: * * *
(a) Extra compensation shall be collected * * * for any services performed * * *.
(b) Two days’ extra compensation shall be paid * * * for any Sunday on which any services are rendered between 8 a. m. and 5 p. m.; but all other extra compensation collected from parties in interest * * * shall be held * * * pending clarification of the questions involved. * * *
The foregoing temporary instructions do not provide for extra compensation for services performed on holidays because regular hours of service are now required on the days (except December 25) that are ordinarily observed as holidays.[21]
9. (a) The Act of June 3,1944,[22] amended the Tariff Act of 1930 to exempt highway vehicles, bridges, tunnels, and ferries, from the requirements in the Act of 1911 relating to the payment of extra compensation to the Collector.[23] It also directed that at ports of entry serving automobile and pedestrian traffic the Collector should assign customs officers to duty at such times during the 24 hours of each day as might be necessaryand provided that “officers and employees assigned to such duty at night or on Sunday or a holiday shall be paid compensation in accordance with existing law *921 as interpreted by the United States Supreme Court in the case of The United States v. Howard C. Myers * * *."
(b) On June 3, 1944, the Bureau of Customs issued to Collectors its Circular Letter No. 2439, Supplement No. 2, as follows:
Attached is a * * * copy of the Act * * * which became effective June 3, 1944. * * *
The Department is in some doubt as to whether this Act actually authorizes extra compensation for employees performing inspectional work on Sundays or holidays in connection with traffic over free bridges and highways, in view of the limitation that compensation is to be paid “in accordance with existing law as interpreted * * * in the case of * * * Myers * * *." The matter is * * * being submitted to the Comptroller General for decision, and no extra compensation shall be paid for such services pending further instructions. * * *
10. On June 5, 1944, the Court of Claims entered judgment in Myers on the basis of (1) two days’ pay for work not in excess of an aggregate of eight hours, whether continuous or not, performed within the 24-hour period pf a Sunday or holiday, and (2) overtime pay a,t the rate of one-half day’s pay for each two hours or fraction thereof of at least one hour for all work in excess of an aggregate of eight hours during such 24-hour Sunday or holiday period.
11. (a) On July 8, 1944, the Bureau of Customs issued to Collectors its 'Circular Letter No. 2439, Supplement No. 3, informing them of the action of the Court of Claims as set forth in the preceding finding and continuing a.s follows:
* * * On February 28, 1944, the Supreme Court made an order * * * amending its opinion so as to hold clearly that the statute requires extra compensation for work at any time during the 24 hours of a Sunday or holiday without regard to the hours of the day and that overtime pay, at the same rate as the rate for weekdays, is also applicable to Sundays and holidays when the employees work longer than nine hours with one hour for food and rest. It was not clear whether the nine hours within which the eight hours of work was to be performed before extra compensation at night rates became payable must be consecutive. * * *
. For all Sunday work performed since * * * letter No. 2439 was put into effect [February 26, 1944], for *922 which extra compensation is payable, you shall pay * * * extra compensation on the basis * * * [prescribed by the Court of Claims] * * *. The Comptroller General has not yet rendered a decision as to whether extra compensation is payable * * * in connection with traffic over free bridges and highways and no payments * * * shall be made * * * pending further advice * * *.
(b) On July 17, 1944, the Bureau of Customs issued to Collectors its Circular Letter No. 2439, Supplement No. 4, as follows:
* * * the Acting Comptroller General * * * [ruled] * * * under date of July 6, 1944, that “* * * by reason of the * * * Act [of June 3, 1944] extra compensation is authorized and required to be paid for services performed at free bridges and public highways * * *."
Extra compensation shall be paid * * * for * * * services performed after June 3,1944, in connection with traffic over free bridges and highways * * *.[24]
12. Following is a summary of the Customs Begulations of 1943, as amended (effective on and after December 1, 1944) :
Overtime services'; overtime compensation; rate of compensation. Customs services for which overtime compensation is provided * * * by * * * the Act of * * * 1911 * * * shall be furnished only upon compliance with the requirements * * * for applying for such services and giving security for the reimbursement of the overtime compensation, unless the compensation is non-reimbursable * * *. * * * Customs employees shall not receive overtime compensation for services performed on regular tours of duty at night, but no regular tour of duty shall embrace any part of a Sunday or holiday if the services performed are such that extra compensation would be payable if performed at the request of the private interest. * * *
Night, Sunday, and holiday defined. * * * the word “night” shall mean the time between 5 p. m. of any day and 8 a. m. of the following day, or between the corresponding hours at ports or stations where regular hours for the transaction of the general class of customs business involved other than those from 8 a. m. to 5 p. m. *923 have been established to agree with local prevailing working hours, but shall not include any such time within the 24 hours of a Sunday or holiday. The night hours at the end of the regular workday immediately preceding a Sunday or holiday and the night hours at the beginning of the next regular workday shall be considered for the purposes of this section as part of a single night * * *.
Assignment. * * * No customs employee shall be assigned on a weekday, or for more than an aggregate of 8 hours on a Sunday or holiday, to any overtime service for which non-reimbursable extra compensation is payable, except under special authorization from the Commissioner of Customs. * * *
13. By way of recapitulation, it appears from the foregoing findings that:
(1) No payment of nonreimbursable extra compensation (for services at free highway stations, including free bridges) was made until June 3, 1944, and the Bureau of Customs ultimately established that as the cutoff date, refusing to pay nonreimbursable extra compensation for services performed prior thereto.
(2) Payment of reimbursable extra compensation in conformity with the method of computation adopted by the Court of Claims in the Myers judgment was directed (on July 8, 1944) to be made on and after February 26, 1944.[25]
14. (a) The claims here in suit were separately filed during the period extending from September 1945 to March 1946.[26]
(b) In the meantime, other cases involving the application of the Act of 1911 (or its counterpart relating to the Immigration Service) [27] and the Myers decision of the Supreme Court have been before this court.
*924 ■ In 1945 two immigrant inspectors stationed at the port of Detroit sued in this court for extra compensation for services rendered on regular tours of duty on Sundays and holidays. The court held, on the authority, of the Myers decision, that they were entitled to recover.[28]
The case of O'Rourke v. United States[29] presented a series of questions in addition to those which had been determined by Myers. The court held (1) that a customs inspector was entitled to extra compensation as provided in the Act of 1911 for work at a port of entry located on a free public highway; (2) that he was entitled to overtime pay whenever he worked more than an 8-hour tour of duty in any period of 24 hours, regardless of the time of day that the work was done; (3) that overtime pay under the War Overtime Pay Act of 1942,[30] being for hours worked in excess of a 40-hour week, did not conflict with and should not be deducted from extra compensation payable under the Act of 1911; and (4) that so much of the overtime payable under the War Overtime Pay Act of 1943[31] as was payable for work in excess of eight hours in any one day should be set off against what the officer had been or was entitled to be paid for work during the same hours in excess of an 8-hour day under the Act of 1911.
15. (a) Each of the plaintiffs in this action was employed at one or more border ports serving traffic across the international boundary between Canadá and the United States. Following is a list of the ports, the stations served, and the plaintiffs who worked at each port:
Baudette
Stations: Highway,[32] rail, and water.
Plaintiffs: Fadness, McKenna, and Thoe.
*925 INTERNATIONAL FALLS
Stations: Highway (via toll bridge), rail, and water.
Plaintiffs: Anderson, O., Fadness, Houska, and Rokke.
Pigeon Rever Bridge
Station: Highway (via free bridge).
Plaintiffs: Hoff and McKenna.
Ranier
Stations: Rail and water.
Plaintiffs: Clapp, Hoff, and Rose.
Sumas
Stations: Highway (open), and rail.
Plaintiff: Thomas.
Warroad
Stations: Highway (open), rail, and water.
Plaintiffs: Anderson, G. J., Ault, and Sanderson.
(b) Three of the plaintiffs worked at more than one of the ports during the period covered by their claims: Fadness, at Baudette and International Falls; Hoff, at Pigeon River Bridge and Ranier; and McKenna, at Baudette and Pigeon River Bridge. Each of the other ten plaintiffs was stationed at the port indicated in the preceding subsection throughout the period involved in his claims.
(c) The port of Sumas is in the State of Washington. The other five ports are in Minnesota, and were at all times material in Customs District No. 36, under the jurisdiction of the Collector of Customs at Duluth.[33]
(d) Five of the six ports had rail service: Baudette, International Falls, Ranier, Sumas, and Warroad. The exception was Pigeon River Bridge, which had only highway service.
Five of the six ports had highway service: Baudette, International Falls,[34] Pigeon River Bridge, Sumas, and Warroad. The port of Ranier had no highway service.
*926 There was traffic by water at four of the ports: Baudette, International Falls, Eanier, and Warroad. The volume of such traffic was minor, in relation to the volume of traffic by rail or highway.
16. The parties have agreed upon audits showing the amounts claimed by the several plaintiffs. Under the authority of prior decisions (Myers and O'Rourke) defendant concedes the right of the plaintiffs (with one exception: Houska) to recover part of their claims. Listed below, opposite the names of the plaintiffs, are: (1) the total amount claimed; (2) the amount which defendant concedes each is entitled to recover; and (3) the amount in dispute.

17. The amounts shown in column (2) of finding 16 were computed on the bases established by Myers and O'Rourke or were derived from computations so made.[35] They represent extra compensation for services performed during the assignments, by the plaintiffs (with amounts), and at the ports shown in the four groups described below:
GROUP l

Assignment: Sundays and, holidays as part of regular tours of duty. Hours, generally from 12: 01 a. m. to 4: 30 a. m:

[36]

Anderson, O- $405. 57 International Falls.
Ault- 999. 85 Warroad.
Clapp- 580. 04 Ranier.
*927 Fadness_ $154.29 Baudette and International Falls.
Hoff_ 1,252.33 • Pigeon River Bridge and Ranier.
McKenna_ 399. 79 Pigeon River Bridge and Baudette.
Rokke_ 384. 76 International Falls.
Sanderson_ 972. 07 Warroad.
Thoe_ 830. 79 Baudette.
Thomas_ 1,188. 54 Sumas.
Group 2

Assignment: Between 8 a. m. of a Sunday or holiday and 8 a. m. of the following day

Anderson, G. J_ $54. 40 Warroad.
Anderson, O_ 12. 77 International Falls.
Ault_ 244. 40 Warroad.
Fadness- 12. 76 International Falls.
Hoff_ 12. 77 Ranier.
Rose_ 16. 11 Ranier.
Sanderson_ 268. 84 Warroad.
Thoe_ 61. 30 Baudette.
Group s
Assignment: Extra hours between 4:30 a. m. and 8 a. m. on weekdays following regular tours of duty begun at 8 p. m. the night before
Anderson, O_ $159. 84 International Falls.
Fadness_ 239. 76 International Falls.
Rokke- 217. 26 International Falls.
Group i

Assignment: One hour extensions of regular 8-hour tours of duty on weekdays after 5 p. m.

Anderson, G. J_ $788. 53 Warroad.
Ault_ 540. 99 Warroad.
Sanderson_ 605. 73 Warroad.
18. The amounts shown in column (3) of finding 16 were computed on the bases established by Myers and O'Rourke or were derived from computations so made.[37] They represent claims for extra compensation for services performed during the assignments, by the plaintiffs (with amounts), and at the ports shown in the five groups described below:
*928 GROUP 1

Assignment: Sundays and holidays; short, irregular periods of extra duty (i. e., not within any regular tour of duty)

Clapp_ $90. 80 Ranier.
Hoff_ 31. 66 Ranier.
Rose_ 476. 17 Ranier.
Thomas_ 251. 85 Sumas.
Group 2

Assignment: Sundays and holidays; extra duty (i. e., not within any " regular tour of duty) on night shift, beginning (generally) at 5 p. m.

Anderson, G. J_ $23. 31 Warroad.
Anderson, O_ 191. 54 International Palls.
Ault_ 1, 522. 01 Warroad.
Clapp_ 373. 94 Ranier.
Padness_ 19. 17 Baudette.
Hoff_ 206. 59 Ranier.
Houska_ 10. 84 International Palls.
McKenna_ 191. 63 Baudette.
Rokke_ 177. 63 International Palls.
Sanderson_ 1, 355. 76 Warroad.
Thoe_ 409. 01 Baudette.
Group 3

Assignment: Extended hours (in excess of an 8-hour day) on the night shift of the night before a Sunday or holiday

Ault_ $124. 26. Warroad.
Sanderson_ 101. 48 Warroad.
Group 4

Assignment: Weekdays (other than days after Sundays or holidays) 4: 30 a. m. to 8 a. m.

Ault_l.~ $1, 278. 07 Warroad.
Sanderson_ 1, 222. 40 Warroad.
Group 5

Assignment: Sundays and holidays, day shift, 8 a. m. to 5 p. m.

Anderson, O_ $144. 74 International Falls.
Fadness_ 59. 38 International Palls.
Houska.,_ 455. 43 International Falls.
Rokke_;_ 164. 75 International Palls.
Thomas_ ' 93. 84 Sumas.
*929 19. (a) The two sets of groups described in findings 17 and 18 have as common denominators services performed (1) on Sundays and holidays (i) before 8 a. m., (ii) between 8 a. m. and 5 p. m., and (iii) after 5 p. m.; (2) during early morning hours from 4:30 a. m. to 8 a. m., on weekdays; and (3) during hours extended beyond an 8-hour day.
(b) Differentiation between the two sets of groups arises (1)from issues of law in relation to Groups 1, 2, 3, and 5 in finding 18, and (2) from issues of fact in relation to Groups 4 and 5 in the same finding.
The facts recited in the next 17 findings (20 through 36) have been selected for presentation in the order shown for the purpose of indicating why the items of claim in finding 17 have been conceded and why the items of claim in-finding 18 are contested.[38]
20. At each of the ports and throughout the 5-year period in suit (October 1, 1939, through September 30, 1944)
(1) Assignments to duty were made on a weekly basis, and included specification of hours of extra duty on special assignment as well as regular tours of duty.
(2) The workweek was divided into daily shifts, which included (a) time within the official hours of service (considered as regular tours of duty) and (b) such “overtime” hours (considered as periods of extra duty) as were necessary to take care of the business of the port.[39]
(3) The inspectors were assigned to shifts under a platoon system. The shifts were rotated among the inspectors on any basis that was practicable for the needs of the port and the number of men there available. The time (hour of beginning) and the length (hours of duration) of shifts varied from port to port as local needs and manpower varied.
(4) The designated official hours of business comprised the overall periods (daily and weekly) during which the en *930 tire cost of providing inspection services was borne by the Bureau of Customs.[40]
(5) The converse was not true. Customs was never relieved of all of the cost of providing inspection services during all of the hours of extra duty (special assignments outside of regular tours of duty) at any of the ports, except at International Falls prior to June 3,1944, where all extra assignments were in connection with the toll bridge.[41]
(6) Defendant required reimbursement for services performed in connection with rail and toll bridge traffic, during hours of extra duty, and paid extra compensation to the officers performing such services in accordance with the regulations in effect at the time.[42]
21. From October 1, 1939 (the beginning of the period in suit), through February 26, 1944, (i. e., before Myers):[43]
(1) Official hours of business were so scheduled that every day (Sunday, holiday, and weekday) contained some such hours, although no period of official hours had its beginning on a Sunday or holiday. Official hours of business began at 8 a. m. of every day except a Sunday or holiday, and extended *931 to 4:30 a. m. of the next day, thereby accounting for a time lapse of 20% hours. The crossing of the line of the calendar day, and the absence of any commencement of official hours on Sundays and holidays, created the following situations in relation to Sundays and holidays and the days preceding and following them: (a) the first 4% hours of a Sunday or holiday (from 12: 01 a. m. to 4:30 a. m.) became the last 4% hours of the official hours of business of the day preceding a Sunday or holiday; (b) the next 3y2 hours of a Sunday or holiday (from 4: 30 a. m. to 8 a. m.) were night hours and subject to special assignment to duty; (c) the next 9 hours of a Sunday or holiday (8 a. m. to 5 p. m.) were also subject to special assignment to duty, being outside of official hours; (d) the last 1 hours of a Sunday or holiday (5 p. m. to midnight) were night hours outside of official hours, and therefore subject to special assignment to duty; and (e) the first 8 hours of the day following a Sunday or holiday (12:01 a. m. to 8 a. m.) elapsed before there was any further commencement of official hours, wherefore they were subject to special assignment to duty.
(2) The spread of the official hours of business over 20% hours of a 24-hour period left 3% hours (from 4:30 a. m. to 8 a. m.) on all days outside of official hours and subject to special assignment to duty, if services were provided at the port during those hours.
(3) Generally, three shifts were assigned on weekdays to cover the 20% hours of official business. One shift began at 8 a. m. and extended to 5 p. m., with one hour for food and rest. Another shift began at 11 a. m. and extended to 8 p. m., with one hour for food and rest. A third shift began at 8 p. m. and extended to 4:30 a. m., with a half hour for food and rest.
(4) The hours between 4:30 a. m. and 8 a. m. of weekdays [44] were covered (if and to the extent served) by special assignments to duty outside of regular tours of duty, although usually by way of extended (extra) hours on the night shift (8 p. m. to 4:30 a. m.). The officer on duty on the night shift *932 was required to remain on duty (by special assigmnent to extra duty) for sucb time after 4:30 a. m. and before 8 a. m. as Ms services were needed.
(5) The hours between 4:30 a. m. and 8 a. m. of Sundays and holidays, because of their juxtaposition to the hours of the night shift of the calendar day preceding, were covered in the same manner as that described in the preceding paragraph, by special assignment to extra duty through extended hours insofar as services were needed.
(6) The hours after 4: 30 a. m. of a Sunday or holiday and before 8 a. m. of the next calendar day were subject altogether to assignments to special duty.
(7) Two shifts were assigned to the 24-hour period of 8 a. m. on a Sunday or holiday to 8 a. m. of the next day. One shift extended from 8 a. m. to 5 p. m. These hours were designated as the established hours for Sundays and holidays, to distinguish them from the official hours of other days. No time was allowed for food and rest during these established hours. The second sMft began at 5 p. m., and remained on duty until 8 a. m. of the next day unless the absence of need for services permitted earlier termination of the shift. ■
(8) Customs regulations recognized as assignments to special duty all services performed (a,) between the hours of 4:30 a. m. and 8 a. m. on (i) weekdays and (ii) Sundays and holidays and (b) between 8 a. m. of Sundays and holidays and 8 a. m. of the days following such Sundays and holidays.
(9) Extra compensation was payable for services performed on assignments to special duty only if such extra compensation was obtained by reimbursement. Extra compensation so paid was paid for “reimbursable overtime.” All other services on such special assignments were considered as “uncompensated overtime.” The only sources of reimbursement were the carriers by rail and the toll bridge at International Falls.
(10) Such extra compensation as was*paid was computed at the rates listed below. For services performed—
(i) Between 4:30 a. m. and 8 a. m. of any day, including Sundays and holidays, the “overtime” rate of the 1911 *933 Act was applied,[45] subject to a limitation that the amount should not exceed one day’s pay;
(ii) Between 8 a. m. and 5 p. m. on Sundays and holidays, the rate was two days’ pay; and
(iii) Between 5 p. m. of a Sunday or holiday and 8 a. m. of the next day, the statutory “overtime” rate was applied, subject to the limitation that the amount should not exceed 2% days’ pay.[46]
(11) No part of the (reimbursable) extra compensation paid for services performed after 8 a. m. and before 5 p. m. on a Sunday or holiday was computed at the statutory “overtime” rate.
(12) No part of the (reimbursable) extra compensation paid for services performed before 8 a. m. and after 5 p. m. within the 24 hours of a calendar day which was a Sunday or holiday was computed at the statutory Sunday-holiday rate.
22. Effective February 27,1944 (i. e., after Myers):[47]
(1) The official hours of business continued to be 20% hours per day, except as to Sundays and holidays, none of which were included. The official hours began at 8 a. m. of every day except a Sunday or holiday, and extended to 4:30 a. m. of the next day unless such day was a Sunday or holiday, in which event the official hours ended at midnight of the day before such Sunday or holiday.
(2) The new limitation on official hours meant that all of the 24 hours of the calendar day of a Sunday or holiday were subject to assignments to special duty.[48] The hours from 12:01 a. m. to 4:30 a. m. of the day following a Sunday or holiday remained in the category of assignments to special duty, as did the hours between 4:30 a. m. and 8 a. m. of such days and of weekdays not following a Sunday or holiday.
*934 (3) The established hours of service for Sundays and holidays were divided as follows: 12 midnight to 8 a. m.; 8 a. m. to 5 p. m.; and 5 p. m. to 12 midnight.[49]
(4) The Bureau of Customs threatened to enforce reimbursement from the toll bridge at International Falls for services performed during “overtime” hours (at night) and on Sundays and holidays in accordance with the Myers decision.
(5) Extra compensation was paid for services performed on assignments to special duty insofar as such extra compensation could be charged for reimbursement by railroads and the toll bridge.[50]
23. Effective June 3, 1944 (marking the passage of the bridge bill, as recited in finding 9), extra compensation was paid in accordance with the decision by the Comptroller General (finding 11) for services performed on assignments to extra duty irrespective of reimbursement by licensees.
24. As of July 8, 1944, by Supplement No. 3 to Circular Letter No. 2439 (finding 11) the Bureau of Customs directed the Collectors to pay extra compensation for services performed since February 26, 1944 (effective date of Circular Letter No. 2439), on assignments to duty on Sundays[51] irrespective of hours [52] and at the rates prescribed by the Court of Claims in its judgment in Myers.[53]
25. Effective October 1, 1944,[54] as to the ports of Baudette, International Falls, and Ranier:
*935 (1) The official hours of business were established as 24 hours per day seven days per week.
(2) Regularly assigned 8-hour shifts were established to provide full-time services.
26. (a) All of the ports and all of the plaintiffs (except Houska) are named in the groups described in finding 17 (containing the items conceded by defendant).
(b) All of the services performed in all of the groups described in finding 17 were, under the regulations then in effect, “uncompensated overtime” services.[55] Inasmuch as no extra compensation was payable for such services under the regulations then applicable, none was paid; and no extra compensation has since been paid for any of the services listed.[56]
(c) The amounts listed under Group 1[57] of finding 17 were, by agreement of the parties, established on the basis of two days’ pay for every Sunday or holiday on which services were performed on regular tours of duty,[58] subject to deduction of amounts already paid for the next succeeding hours of compensable duty on special assignment worked on the same Sunday or holiday which, together with the hours of the regular tour of duty, aggregated eight hours of service during the 24 hours from 12: 01 a. m. to 12 p. m. on the Sunday or holiday.[59]
(d) The amounts listed in Groups 2,[60] 3,[61] and 4[62] of finding 17 reflect the payments due for services performed as uncompensated overtime, as described in subparagraph (b) above.
*936 27. (a) All of the ports (except Pigeon River Bridge) [63] and all of the plaintiffs are named in the groups described in finding 18 (containing the items contested by defendant).
(b) All of the services performed on all of the assignments described in finding 18 included (or were performed on days which included) some overtime or Sunday-holiday services that were reimbursable under the regulations in effect at the time the services were performed. Such extra compensation as was so payable has been paid.
(c) There is no issue of fact as to Groups l,[64] 2,[65] and 3[66] of finding 18. The services were performed; the assignments were made for extra duty; and extra compensation as described in the preceding paragraph has been paid. The plaintiffs claiming in these groups demand the difference between the amounts resulting from standards of computation approved in Myers and ORourlte and the amounts that have been paid.
(d) Defendant does not challenge the standards approved in Myers and ORourJee. Neither does it challenge plaintiffs’ contention that the facts in this case fall within the pattern of Myers and O'Rourlce. It contends only that plaintiffs have already received all extra compensation that was payable under the regulations in effect when the services were performed; wherefore, defendant says, it is not obliged to make additional payments based on recomputations.[67]
(e) There is no issue of law as to Group 4[68] of finding 18. *937 The issue of fact is whether or not the two inspectors at the port of Warroad actually worked the hours claimed, or whether (to the extent that each remained at his station during such hours) their presence at the station during such hours was voluntary and for their own convenience.
(f) Group 5 [69] of finding 18 involves an issue of law (being the same as in Groups 1, 2, and 3, as stated in subparagraph (d) above), and an issue of fact, viz: Whether or not the four inspectors at International Falls and the one inspector at Sumas were actually on duty one full hour in addition to an 8-hour shift, or whether the time used on the job in consuming sandwiches and coffee should be charged to them, thereby making their time on duty short of a full ninth hour.[70]
28. As shown in Group 1 of finding 18, plaintiffs Clapp, Hoff, Eose, and Thomas worked short, irregular periods of extra duty on Sundays and holidays.[71] All such periods were on special assignments to extra duty. None was part of a regular tour of duty. Each of these plaintiffs was paid extra compensation for such services at the overtime rate.[72] Each now claims the difference between two days’ pay (as the Sunday and holiday rate)[73] and the amount he has received. The amounts of those differences are shown in Group 1 of finding 18.
29. As shown in Group 2 of finding 18, eleven of the plaintiffs worked on the night shifts of Sundays or holidays. The night shift usually began at 5 p. m., but there were instances when it began later. Each of these night shifts was on assignment to special duty.
Each of these plaintiffs was paid extra compensation (by way of reimbursable overtime) computed at the overtime rate (% day’s pay for each two hours or fraction thereof *938 of at least one hour) for part of the hours of extra duty so performed. Each of them claims the difference between the amounts computed on the bases established by Myers and O'Rourke for all of such hours of extra duty and the amounts that have been paid.
Minor variations appear in the patterns of work of the various plaintiffs, largely as a result of variations in the inspection coverage of the four ports at which they worked. These variations, insofar as material, are described in the next succeeding four findings (30 through 33).
30. (a) At the port of Baudette three of the plaintiffs (Fadness, McKenna, and Thoe) worked Sunday and holiday night shift hours.
(b) The port was manned by three officers under the platoon system. The officers rotated the shifts so that each one drew some of the Sunday-holiday night shifts. These shifts began at 5 p. m. and lasted until such time before 8 a. m. of the next day as the officer cleared the last train. The closing hour varied (1) with the seasons and (2) with the rail traffic. During his hours on duty the officer remained at his post continuously, taking no time off for meals.
Occasionally, there were no trains a>t Baudette during a Sunday or holiday night shift, and sometimes the last train passed before midnight.[74] On these occasions the officer could (and did) close the shift (1) around 10:30 p. m. in the season when the river ferry was in operation; (2) around midnight when there was vehicular or pedestrian traffic across the frozen river; and (3) at varying early hours during the spring and fall when there was no traffic across the river.[75]
(c) The three plaintiffs hereinabove named in this finding were paid reimbursable overtime computed at overtime rates for those hours within each night shift on Sundays or holidays during which they rendered services in connection with train traffic. They have not been paid extra compensation for any of the other hours of duty performed on such shifts. *939 Their claims (as shown in Group 2 of finding 18: Fadness, $19.17; McKenna, $191.63; and Thoe, $409.01 are for the difference between the total amounts (computed at the overtime rate) for all of the hours of extra duty on such shifts, and the amounts that have been paid them through reimbursable overtime for parts of the same shifts.
31. (a) At the port of International Falls three of the plaintiffs (O. Anderson, Houska, and Bokke) worked Sunday and holiday night shift hours.
(b) International Falls was the busiest of the six border ports involved in this case. It was serviced 24 hours a day, every day. The Sunday-holiday night shift (of 15 hours, from 5 p. m. to 8 a. m. of the next day) was divided into two periods: 5 p. m. to midnight; and midnight to 8 a. m. Two officers were assigned to the night shift. Each took one of the periods to handle alone, and was allowed no time off duty for food and rest.
(c) Keimbursable overtime computed at overtime rates was paid for those hours within each Sunday-holiday night shift during which services were rendered in connection with toll bridge or rail traffic. There was enough of this traffic to provide extra compensation through reimbursable overtime for virtually all of each such night shift.
(d) Prior to March 1,1941, the Bureau of Customs limited the amount that could be paid to the two officers together to the amount payable under the regulations to one man for one night, namely, a total of 2y2 days’ pay. This allowance was divided on the basis of 1% day’s pay to the officer who had the 5 p. m. to midnight trick,[76] and 1 ys day’s pay to the officer who had the 8-hour trick beginning at midnight.[77] Effective March 1,1941, the limitation of 2y2 days’ pay was applied separately.[78]
(e) The three plaintiffs concerned (O. Anderson, $191.54; Houska, $10.84; and Kokke, $177.93) claim the differences (as set forth opposite their names) between the total amounts *940 (computed at tbe overtime rate) for all of the hours of extra duty on the Sunday-holiday night shifts prior to March 1, 1941, and the amounts that have been paid them for such hours on the basis of a single shift limitation applied to them jointly.
32. (a) At the port of Earner two of the plaintiffs (Clapp and Hoff) worked Sunday and holiday night shift hours.
(b) At this port the Sunday-holiday night shift began at 7 p. m. or 8 p. m., instead of 5 p. m. It continued until such time before 8 a. m. of the next day as was required to clear the last train. Occasionally, the shift ended before midnight (e. g., 10:40 p. m., or 11:45 p. m.). More often the shift extended past midnight (e. g., 1:05 a. m., or 6: 30 a. m).
(c) The plaintiffs (Clapp and Hoff) were paid extra compensation at the overtime rate for duty on such night shifts.[79] Their claims (Clapp, $373.94, and Hoff, $206.59) are for the differences between the amounts computed at the Sunday and holiday rate for the hours worked on a Sunday or holiday (i. e., before midnight) and the amounts that have been paid to them.
33. (a) At the port of Warroad three of the plaintiffs (G. J. Anderson, Ault, and Sanderson) worked Sunday and holiday night shift hours.
(b) The port was manned by three officers under a modified platoon system. G. J. Anderson was a deputy collector. He usually worked in the daytime, while Ault and Sander-son rotated in day shifts and night shifts. In this manner the port was usually covered by two men during the day and one at night.
The Sunday-holiday night shift began at 5 p. m. The termination of the shift is not in issue in the claims listed in Group 2 of finding 18 (G. J. Anderson, $23.31; Ault, $1,522.01; and Sanderson, $1,355.76).
(c) These officers were paid reimbursable overtime, computed at overtime rates, for as many of the Sunday or holiday night shift hours as were devoted to the servicing of rail traffic (as indicated by Customs’ billing of the carriers). *941 The remaining hours of such night shifts were considered to be noncompensable, and plaintiffs have not been paid extra compensation for them. Their claims are for the differences between the total amounts, computed at overtime rates, for all of the hours of extra duty on such shifts prior to 4:30 a. m., and the amounts that have been paid them through reimbursable overtime for part of the hours of the same shifts.
34. As shown in Group 3 of finding 18, plaintiffs Ault and Sanderson worked extended hours on night shifts that began on the night before a Sunday or holiday. Ault worked 35 such shifts from 6 p. m. to 4: 30 a. m., and one shift from noon to 4: 30 a. m. Sanderson worked 22 shifts from 6 p. m. to 4: 30 a. m., one shift from 5 p. m. to 4:30 a. m., and two shifts from noon to 8: 00 a. m. Their claims (Ault, $124.26, and Sanderson, $101.48) are for extra compensation for the hours in excess of eight on each such extended shift.
As shown in Group 4 of finding 17, defendant concedes the right of the three officers stationed at Warroad to recover for hours in excess of eight when worked on night shifts during weekdays. Defendant denies the right of the two officers above named to recover for hours in excess of eight worked on the night shifts of days preceding Sundays and holidays.[80]
35. (a) As shown in Group 4 of finding 18, plaintiffs Ault and Sanderson were also responsible for the coverage of the port of Warroad during the early morning hours between 4:30 a.; m. and 8 a. m., on all days, Sundays, holidays, and weekdays. Their claims for these extended hours are substantial (Ault, $1,278.07, and Sanderson, $1,222.40) and depend entirely on an issue of fact as to whether or not the services were performed.
(b) As noted in finding 33 (b), G. J. Anderson was a deputy collector, stationed at Warroad. Ault and Sanderson were inspectors. The three men comprised the staff at the port. Anderson ordinarily took the day shifts, beginning at 8 a. m., while the later shifts were manned by Ault and San-derson, who rotated on the various afternoon and night shifts.
Traffic at Warroad moved by rail and open highway. The highway was built in 1938.
*942 Kail traffic through Warroad was such that the inspector who had the regular tour of duty ending at 4:30 a. m. was almost always required to remain on duty until sometime between 6:30 a. m. and 7 a. m. to service a train.
The official hours of business at Warroad were 20% hours per day, as they were at all of the ports prior to October 1, 1944.
When the highway was opened in 1938, the deputy collector, Anderson, directed the inspectors, Ault and Sanderson, to remain on duty during the full period from 4:30 a. m. to 8 a. m. Anderson was authorized by the regulations to issue such a direction. Thereafter, Ault or Sanderson (depending on who had the shift) remained at the port until Anderson came on duty at 8 a. m. The port was thus covered on a 24-hour basis.
36. (a) As shown in Group 5 of finding 18, five of the plaintiffs (O. Anderson, Fadness, Houska, Kokke, and Thomas) worked day shifts on Sundays and holidays extending from 8 a. m. to 5 p. m. Thomas was at the port of Sumas in the State of Washington. The other four were at International Falls. Each of the five plaintiffs was paid two days’ extra compensation for each such shift worked by him, and each now claims additional extra compensation amounting to % day’s pay[81] on the ground that the shift was nine hours in duration.
.(b) Defendant denies the right of these plaintiffs to recover because of (1) the issue of law defined in finding 27 (d) and (2) the issue of fact as to whether the plaintiffs were on duty the full nine hours.
(c) As noted in finding 22 (3), as modified by footnote 49, the established hours of service for Sundays and holidays were rearranged, after the Myers decision and the adoption of the bridge bill, to provide three 8-hour shifts extending from midnight to midnight, with no time off for meals. If these shifts comprised full 8-hour periods on duty, the Bureau of Customs would appear to have negatived defendant’s contention that the previous 9-hour shift did not constitute nine full hours on duty.
*943 Defendant’s contention that these inspectors at Sumas and International Falls were not on duty the full nine hours between 8 a. m. and 5 p. m. is based on the fact that the men ate lunch (consisting of sandwiches and coffee) sometime during the day, as and if the demands of traffic would permit; and that consequently the ninth hour fell short of 60 minutes.
None of the men left the port or took time to relax while eating a meal. Their wrapping paper lunches supplied their need for food just as the cooler supplied their need for water. Both were taken in the same way: as and when the need arose and opportunity would permit.
HANDLY GROUP[1]
1. Each of the plaintiffs is a citizen of the United States, and was employed by defendant as a customs inspector during some or all of the time between April 4,1937, and April 3, 1944. During such employment each of the plaintiffs was required to and did perform certain Sunday and holiday services in addition to his weekly tours of duty within the 24-hour period of certain Sundays and holidays, and for which he was paid overtime at the overtime rate computed pursuant to the then existing applicable regulations.
2. The Collector of Customs for the district where plaintiffs were employed certified audits as to each plaintiff-showing the difference in amounts of payments already made as overtime compensation under existing regulations and the amounts of payments for such Sunday and holiday services computed according to the decisions in Myers v. United States, 320 U. S. 561, and O’Rourke v. United States, 109 C. Cls. 33.
3. If plaintiffs are entitled as a matter of law to recover, the amounts of their recoveries are as follows: William G. Handly, $635.13; Harry R. Hunt, $382.08; Hugh S. Lyon, $435.71.
*944 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States the amounts set forth below:

 19 U. S. C. 267.

 Findings 35 and 36, Sanderson.

 Act of March 3, 1873, R. S. 2871, 17 Stat. 579.

 The first comprehensive revision of the customs laws provided that no ship subject to inspection should be unloaded after sundown or before sunup except by special license from the collector of the port. Act of March 2, 1799, 1 Stat. 627, 665.

 These sections now appear as sections 450 and 451 of the Tariff Act of 1930, 46 Stat. 708; 19 U. S. C. 1401, 1450, and 1451.

 The Act of March 2, 1931, 46 Stat. 1467, made provision for inspectors and employees of the Immigration Service in much the same manner as the Act of 1911 had provided for customs inspectors. The test cases on this statute were: Renner and Krupp, 106 C. Cls. 676 (1946) ; Gibney, 114 C. Cls. 38 (1949) ; Taylor, 114 C. Cls. 59 ; and Ahearn, 114 C. Cls. 65.

 See “Customs Service Pay Cases” and “Immigration Service Pay Cases” in the tables of cases reported in Court of Claims Reports, volumes 103 through 131.

 B—83430, B-82859, and B-79866, August 1, 1949.

 Defendant has conceded the right of each of the plaintiffs in the Sanderson group, except Houska, to recover part of his claim. The exception is predicated on the fact that all of Houska’s services were performed on assignments to extra duty, whereas each of the others performed some services on regular tours of duty.

 See finding 13 (2), note 25, Sanderson group, citing the Chief Counsel’s letter of March 3, 1950.

 By order of the court, dated June Id, 1953, allowing a joint motion to consolidate cases, the 14 cases listed in the Schaible caption were consolidated. The same order provided (1) for the consolidation of 13 other cases in a separate group under the heading of Alpheus M. Sanderson, No. 46764, and (2) for the consolidation of the two groups of cases (Schaible and 13 others and Sanderson and 12 others) “for purposes of briefing and argument * * *."

 See finding 3 for definition of “assignments to duty outside regular tours of duty.”

 The circumstances relating to the services of the plaintiff Weld at the port of Seattle were not different from those relating to the services of the Baltimore plaintiffs in any material respeet.

 See 19 CFR, Chapter I (1938).

 19 CFR, 1943 Supp.

 19 U. S. C. 267.

 19 V. S. C. 1451.

 19 C F R, 1944 Supp.

 320 U. S. 561, decided January 3, 1944 (explanatory opinion 321 U. S. 750, February 28, 1944).

 The parties have agreed upon audits of the services performed, and on the computations showing the differences in compensation which are listed in this finding.

 The only service's performed by plaintiff Schaible on Sunday, May 30, 1943, were on special assignment from 5 p. m. to 9 p. m. He was paid one day’s pay for such services in accordance with regulations then in effect. The ‘ only services performed by plaintiff Schaible on Sunday, October 24, 1943, Were on special assignment from 5 p. m. to 11 p. m., for which he was paid one and one-half day’s pay in accordance with regulations then in effect.

 Except for services on four days (June 15, 1941, December 25, 1942, July 25, 1943, and December 25, 1943), the periods of duty performed by plaintiff Weld on the Sundays and holidays Included In suit were on special assignments of varying duration, beginning at or after 5 p. m. on the Sunday or holiday and continuing for one hour or more but to not later than 11 p. m. on such day.

 Art. 1242, Cust. Reg. 1937 (19 CFR 22.22, 1939 Ed.).

 Art. 1243, Cust. Reg. 1937, as amended by T. D. 49588, June 1, 1938 (19 CFR, 2.1, 1939 Ed.).

 Art. 1244, Cust. Reg. 1937 (19 CFR 22.23, 1939 Ed.).

 Art. 1245, Cust. Reg. 1937 (19 CFR 22.24, 1939 Ed.).

 Art. 1461, Cust. Reg. 1937, as amended by T. D. 49588, June 1, 1938 (19 CFR 1.4, 1939 Ed.).

 Art. 1462 Cust. Reg. 1937 (19 CFR 1.5, 1939 Ed.).

 Effective beginning July 1, 1943 (19 CFR, 1943 Supp.).

 Following is footnote 7, as cited in the text: “The national holidays are January 1, February 22, May 30, July 4, the first Monday in September, November 11, the fourth Thursday in November, and December 25. If a holiday falls on Sunday, the following day will be observed. Other days may be designated as national holidays by Executive Order of the President.”

 Following is footnote 8, as cited in the text: “New working hours throughout the Customs Service are prescribed by special instructions for duration of the war.”

 Following is footnote 5, as cited in tlie text: “National holidays are: January 1, February 22, May 30, July 4, the first Monday in September, November 11, the fourth Thursday in November, and December 25.”

 By T. D. 51149 (9 F. R. 13912), effective on and after December 1, 1944 (19 CFR, 1944 Supp.).

 Following is footnote 3, as cited in the test: “Text of 19 U. S. C. 267 omitted.”

 Following is footnote 4, as cited in tbe text: “Text of 19 U. S. C. 1451, as amended by section 1 of Public Law 328, 78th Congress, omitted.”

 Following is footnote 5, as cited in the text: “The days usually observed as national holidays are: January 1, February 22, May 30. July 4, the first Monday in September, November 11, Thanksgiving Day, and December 25.”

 Following is footnote 5a, as cited in the text: “For example: At a port where the regular hours of business have been fixed at 8 a. m. to 4 p. m. for the Inside force and 7 a. m. to 4 p. m. for the outside force, a cleric whose regular working hours are 8 a. m. to 4 p. m. is not entitled to reimbursable extra compensation if assigned to inspeetional work from 7 a. m. to 8 a. in. on a weekday, since he works within the regular hours for the service to which he is assigned.”

 By order of the court, dated June 10, 1953, allowing a joint motion to consolidate cases, the 13 cases listed in the Sanderson caption were consolidated. The same order provided (1) for the consolidation of 14 other cases in a separate group under the heading of Gorman L. Schabble, No. 46945, and (2) for the consolidation of the two groups of cases (Sanderson and 12 others and Sohaible and 13 others) “for purposes of briefing and argument * * *."

 This statute is sometimes referred to hereinafter as the Act of 1911. The original statute appears in 36 Stat. 901. It was amended by the Act of February 7, 1920, 41 Stat. 402. For its present form, see 19 U. S. C. 267.
The Act of 1911 provides in substance for “a reasonable rate of extra compensation for overtime services” of customs officers “who may be required to remain on duty between the hours of five o’clock, post meridian, and eight o’clock, ante meridian, or on Sundays or holidays” * * *, the rates * * * “to be fixed on the basis of one-half day’s additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o’clock, post meridian (but not to exceed two and one-half days’ pay for the full period * * *), and two additional days’ pay for Sunday or holiday duty.” The Act further provides that the extra compensation shall be paid by the “vessel or other conveyance” requiring the services, the payment to be made to the Collector of Customs “who shall pay the same to the several customs officers * * *."

 Although the personal representatives of the claimants have been substituted on suggestion of death of the original plaintiffs in suits numbered 46783 (Thoe) and 46933 (Fadness), the word “plaintiff” as used in these findings refers to the customs officer who is (or was) the claimant, unless such meaning is clearly inappropriate.

 The period covered by the claim of Grover C. Thomas, No. 46565, ended with May 1944.

 The Joint Resolution of December 22, 1942 (56 Stat. 1068), extended to civilian employees of the united States generally the overtime provisions (time- and-one-half for work in excess of 40 hours in an administrative workweek) of the Acts of June 28, 1940 (54 Stat. 676), October 21, 1940 (54 Stat. 1205), and June 3, 1941 (55 Stat. 241). See also the Act of July 3, 1942, 56 Stat. 645.

 The Act of May 7, 1943, 57 Stat. 75, provided for the continuation of overtime pay for work in excess of 40 hours in an administrative workweek, and also preserved the rights of certain employees to receive overtime compensation for work in excess of 8 hours per day (as the 1942 Act had not done).

 In O’Rourke v. United States, 109 C. Cls. 33 (decided June 2, 1947), payments for overtime in excess of 8 hours in one day under the 1943 Act were held subject to setoff against payments otherwise similarly due under the 1911 Act.

 Act of March 2, 1799, 1 Stat. 627.

 Section 50, 1 Stat. 665.

 Act of March 2, 1799, 1 Stat. 704, 707.

 45 Stat. 955 ; 19 U. S. C. 6 (a), (1946 Ed.).

 R. S. 2871, 17 Stat. 579.

 The folio-wing concepts of “overtime” as the basis for extra pay are material. (1) The exaction of extra pay for “overtime” work is basically a penalty, designed to discourage the requirement of such work. In this respect It is in contrast to premium pay or shift differentials Intended as inducement for performing work during less desirable hours. (2) As a penalty payment, “overtime” wages may be demanded (a) for work performed out of time, as at night, or on Sundays or holidays, or in any manner calculated to call workmen to the job at times when other workmen are normally enjoying leisure; or (b) for work performed in excess of stated hours per day or per week. Historically, the exaction of overtime pay by American workmen was begun *916 well oyer a century ago. At that time the 12-hour day and six-day week were accepted as standard. (The 10-hour day did not become general until the closing years of the 19th century.) When the exaction of overtime pay was begun, therefore, such pay related almost wholly to a penalty payment for working out of time instead of working extra hours. Premium pay in the nature of shift differentials reflects a much later development in labor economics than overtime.

 These sections now appear as sections 450 and 451 of the Tariff Act of 1930, 46 Stat. 708, 715 ; 19 U. S. C. 1401, 1450, and 1451.

 Following the statutory provision for annual salaries for inspectors, the customs regulations were revised in 1928. The pattern applicable to the cases In suit, was begun in that revision. Further revisions were made in 1937 and again in 1943. These were the regulations in effect during the period of plaintiffs’ claims. Pertinent portions of them are set forth in the Schaible case, No. 46945, in findings 11 and 12, and are incorporated herein by reference.

 As amended, and effective June 1, 1938.

 Three separate rates of pay are implicit in the foregoing provisions t (X) one day’s pay (regular) for services performed on any weekday from 8 a. m. to 5 p. m.; (2) two days’ pay (extra) for services performed from 8 a. m. to 5 p. m. on Sundays and holidays; and (3) overtime (not to exceed 21/2 days’, pay) for services performed at night on any day (weekday, Sunday, or holiday).

 No material change appears here from the Customs Regulations of 1937.

 320 U. S. 561. Less than two months later, on February 28, 1944; an explanatory opinion was filed. 321 U. S. 750.

 Myers v. United States, 92 C. Cls. 447 (decided January 6, 1941) ; 99 C. Cls. 158 (February 1, 1943) ; and 100 C. Cls. 673 (June 5, 1944).

 In Benedetto v. United States, 108 C. Cls. 18, the court held that a customs inspector was not entitled to extra compensation for work on' holidays, because the observance of holidays had been suspended during the period in Question.. The suspension of holidays was covered by departmental orders from the beginning of the war down to May 12, 1943, and from that date was covered by a Presidential order applicable to all executive departments and agencies.

 58 Stat. 269; 19 U. S. C. 1451, 1451a. This Act is sometimes referred to as the bridge bill.

 Belief from the liability for reimbursement was retroactive to January 6, 1941, which was the. date of the first decision by the Court of Claims in Myers. Cf., footnote 20.

 On April 29, 1946, the Bureau of Customs issued to Collectors its Circular Better No. 2439, Supplement No. 7, as follows: “* * * No extra compensation under * * * the Act of * * * 1911 * * * is payable for services performed in connection with traffic over free bridges and highways prior to June 3, 1944.

 On March 3, 1950, the Chief Counsel of the Bureau of Customs advised the National Customs Service Association that “it * * * is our position that claims may properly be made pursuant to the Myers and O’Rourke cases for periods of work for which no 1911 Act overtime was previously paid, but that periods for which payment was previously made under the 1911 Act as then interpreted should not now be reopened for readjustment. * * *"

 The purpose of the present recitation of the background of customs’ claims for extra compensation is to isolate the unresolved questions that are responsible for the instant claims being at issue.

 The Act of March 2, 1931, 46 Stat. 1467, made provision for extra compensation for overtime services of inspectors and employees of the Immigration Service in much the same manner as the Act of 1911 had provided for customs Inspectors.

 Renner v. United States, 106 C. Cls. 676. Other cases In tills court relating to immigration inspectors include Gibney v. United States, 114 C. Cls. 38, Taylor v. United States, 114 C. Cls. 59, and Ahearn v. United States, 114 C. Cls. 65.

 109 C. Cls. 33, decided June 2, 1947. Two other cases involving customs Inspectors were decided at the same time and on the same basis. Brown v. United States, 109 C. Cls. 52, and Ostroot v. United States, 109 C. Cls. 57.

 56 Stat. 1068.

 57 Stat. 75.

 The highway was connected across the river by a ferry during the summer. During the winter travelers crossed on the ice. The crossing was impassable during a few weeks in the spring and fall.

 During tiie period in suit, the Collector of Customs at Duluth was J. L. Travers, until December 28, 1940, and Ered A. Russell beginning November 1, 1941. J. LaMoure, Jr., was Assistant Collector of Customs throughout the period and served also as Acting Collector from January through October 1941.

 International Rails was the only highway port served by a toll bridge.

 See finding 26 (c).

 These early morning hours fell in a regular 8-hour tour of duty begun at 8 p. m. the night before. Defendant now concedes they are compensable (1) because they were within regular tours of duty and fell on a Sunday or holiday, and (2) because, at the time the services were performed, extra compensation was not payable under the regulations then applicable. See finding 21 (9) and ef., finding 26 (c).

 Cf., finding 27 (c).

 In other words, Isolation of the issues raised in relation to finding 18 items depends on explanations of finding 17 concessions.

 In this respect the regulations occasionally failed to differentiate between “overtime” as night hours during weekdays and Sunday and holiday daytime assignments. This failure is sometimes misleading in view of the distinction hereinafter noted between the applicable rates of compensation as (i) the “overtime” rate and (ii) the “Sunday and holiday” rate.

 In other words, during the period in suit (whether before Myers or after), no extra compensation was payable for services performed during official hours of business. Because this pattern was of value administratively, Customs changed the regulations after Myers to bring the official hours of business within the requirements of the decision while at the same time preserving the administrative principle. Cf. finding 22.

 The toll bridge at Interna tional Falls had been charged for and had paid reimbursable overtime for many years. In this respect the treatment accorded it by the Customs Bureau was the reverse of the treatment accorded similar facilities at the port of Detroit, whence came the claims in Myers. Cf. finding 7. The reasons for this differentiation between Detroit and International Falls are not explained by the evidence.

 All of the plaintiffs performed services on special assignments to extra duty, before Myers as well as after. Before Myers, none received extra compensation for such services unless Customs had obtained or was assured reimbursement. After Myers, and before the passage of the bridge bill (the Act of June 3, 1944), none received extra compensation for such services unless Customs had obtained or, as indicated by the decision, should have obtained reimbursement. The bridge bill required further extensions in practice of extra compensation. Cf. finding 23.

 The items listed in findings 21 and 22 are applicable, according to stipulation by the parties, only to the ports of Baudette, International Falls, Eanier, and Warroad. The absence of Pigeon River Bridge is immaterial. See finding 27 (a). The parties have assumed, throughout their stipulation of facts, that there was no material variance of facts at the port of Sumas. Their stipulation is confined to the four ports above named because of the presence of all four in the Duluth district, and because of the elimination on other counts of the port of Pigeon River Bridge.

 As used herein the term “weekdays” is deemed to exclude holidays as well as Sundays.

 “* * * one-half day’s additional pay for each two hours or fraction thereof of at least one hour * * *."

 The 1911 Act specified “* * * not to exceed two and one-half days’ pay for the full period * * *” between 5 p. m. and 8 a. m., for officers “who may be required to remain on duty * * *."

 Cf. footnote 43.

 The former inclusion of the hours from 12: 01 a. m. to 4: 30 a. m. in the official hours of the day preceding a Sunday or holiday was eliminated.

 In July 1944 these shifts were rearranged to cover eight hours each: midnight to 8 a. m.; 8 a. m. to 4 p. m.; and 4 p. m. to midnight, with no time off for meals.

 During the period extending from February 27 to July 8, 1944, Customs directed that (1) reimbursement be obtained for services performed before 8 a. m. and after 5 p. m. on Sundays (holidays were not being observed) and (2) that payment of extra compensation for such services be withheld pending further order. See finding 8. The order to pay the extra compensation irrespective of hours was issued on July 8, 1944. Finding 24.

 Holidays were not then being observed.

 But not irrespective of reimbursement except for services performed after June 3, 1944. (See footnote 24.)

 (1) Two days’ pay (extra) for work not in excess of an aggregate of eight hours, whether continuous or not. (2) For all work in excess of eight hours, overtime (extra) pay at the rate of one-half day’s pay for each two hours or fraction thereof of at least one hour. See finding 10.

 This date was one day after the end of the period in suit but nearly three years prior to O’Ronrhe, which gave emphasis to the 8-hour day in holding that an officer was entitled to extra pay for work in excess of an 8-hour tour of duty in any period of 24 hours, regardless of the time of day the work was done. Finding 14 (b).

 Cf. finding 21 (9).

 Cf. footnote 25 for the Customs ruling that “* * * claims may properly be made pursuant to * * * Myers and O’Rourke * * * for periods of work for which no 1911 Act overtime was previously paid * * *."

 Relating to services performed between midnight and 4: 30 a. m. on Sundays and holidays, as part of regular tours of duty begun on the night before.

 Services performed on regular tours of duty on Sundays or holidays could have been performed only during the hours between midnight and 4:30 a. m., since there were no other regular tours of duty on such days.

 In other words, each plaintiff listed is to recover enough to make up two days’ extra pay for eight hours worked on the Sunday or holiday.

 Assignments between 8 a. m. of a Sunday or holiday and 8 a. m. of the following day.

 Assignments to extra hours between 4:30 a. m. and 8 a. m. on weekdays following regular tours of duty begun at 8 p. m. of the night before.

 Assignments to one-hour extensions of regular 8-hour tours of duty on weekdays.

 All traffic at Pigeon River Bridge passed over the highway via the free bridge. Consequently, all services performed on special assignments to extra hours of duty were, until June 3, 1944, considered as uncompensated overtime. Cf., findings 21 (9) and 26 (b). Defendant concedes liability for the only claims herein asserted for services performed at Pigeon River Bridge. See Group 1 of finding 17. Consequently, no further consideration of services performed at Pigeon River Bridge is required in these findings.

 Short, irregular periods of extra duty on Sundays and holidays.

 Extra duty on night shifts of Sundays and holidays.

 Extended hours (in excess of an 8-hour day) on the night shift beginning on the night before a Sunday or holiday.

 Cf. footnote 25 for the Customs ruling that “* * * periods for which payment was previously made under the 1911 Act as then interpreted should not now be opened for readjustment.” See also Comptroller General Decisions B-79866, B-82859, and B-83439, of August 1, 1949, wherein the Comptroller General refused to apply retroactively the standards laid down in Myers. On April 23, 1951, the claims of plaintiff Houska were denied by the Comptroller General on the same grounds.

 Extended hours, between 4:30 a. m. and 8 a. m., on weekdays, at the port of Warroad.

 Sunday and holiday day shift, 8 a. m. to 5 p. m., under regulations which made no provision for time off for food and rest. Cf. finding 21 (7).

 “* * * one-half day’s additional pay for each two hours or fraction thereof of at least one hour * * *."

 Examples of the assignments follow: 12 : 01 a. m. to 2 a. m.; 12: 45 a. m. to 4:15 a. m.; 4: 30 a. m. to 8 a. m.; 7 a. m. to 8 a. m.; 5 p. m. to 7 p.m.; 5 p. m. to 9 p. m.; 6 p. m. to 8 p. m.; and 7 p. m. to 9 p. m.

 In the examples cited, in the preceding footnote the amounts would range from % day’s pay for one iiour to 1 day’s pay for 3% hours.

 The statute contains a provision for “* * * two additional days’ pay for Sunday or holiday duty.”

 The parties have stipulated that only on rare occasions were there no trains after midnight. The occasions on which there were no trains at all were even more rare.

 In the absence of rail traffic and of traffic across the river, It would have been possible to eliminate the night shift.

 Seven hours (5 p.m. to midnight) computed at the overtime rate (% day’s pay for each two hour's or fraction thereof of at least one hour) would account for two days’ pay.

 Eight hours would also account for two days’ pay.

 So applied, a total of 4 days’ pay, instead of 2%, became payable. Since there were two officers, it was all reimbursable. The claims, therefore, do not include any services of this type after March 1,1941.

 Plaintiff Hoff was not paid for services on such extra duty performed on November 26, 1942. The reason for this omission is not explained by the evidence. The amount is Included in his claim, and the parties have stipulated that he performed the services and was not paid.

 The reason for defendant’s position is not apparent from the record.

 O. Anderson, $144.74 ; Fadness, $59.38; Houska, $455.43 ; Rokke, $164.75 ; and Thomas, $93.84.

 The parties agreed on the facts in each of these three cases, and their agreement was incorporated in a pretrial conference memorandum. The findings which follow reflect a consolidation of the agreed facts in all three cases.